On to the second case, Havlisch v. 655th. Just hold on a second. Sure. Okay. Thank you. May it please the Court, my name is Daniel Rizumna, and I represent Appellants, the Alavi Foundation and Fifth Avenue Company. The District Court held, after a bench trial, that these two U.S. entities, one a New York corporation and the other a New York partnership, were responsible and liable for billions of dollars worth of judgments based on unsatisfied judgments that had absolutely nothing to do with them. Liability here was premised on terrorism judgments. But here, the plaintiffs, groups of creditors to Iran, stipulated and the District Court found that there was no evidence that our clients had anything to do with the acts of terrorism giving rise to these judgments or to terrorism generally. The Iran creditors have asserted that defendants nonetheless are liable, under the terrorism exception to the Foreign Sovereign Immunity Act, under the Terrorism Risk Insurance Act, because they allegedly provided material services or material function or were purportedly controlled or organs of Iran. But as with the forfeiture case, this is not the first time that this matters before this Court. In the previous appeal, this Court reversed and remanded on two very specific issues, both of which dealt with the Terrorism Risk Insurance Act, which I'll call TRIA. First, whether these entities qualified as agencies instrumentalities for purposes of TRIA, and second, whether these were blocked assets being sought. Despite the mandate that said explicitly defendants were statutorily disqualified from being agencies or instrumentalities under the Foreign Sovereign Immunities Act, the District Court found that the partnership, the 655th Avenue Company, could in fact be considered as to whether it was an agency instrumentality, and in fact then found it was. That was against the mandate. The District Court then misapplied the standards under the FSIA and TRIA. Specifically, it applied an overly broad definition of agency instrumentality under TRIA, despite this Court's finding in Kirshenbaum and despite the context of that standard and due process. The District Court also improperly relied on a historical analysis as to whether these two entities were agencies instrumentalities under TRIA and the FSIA, and that was explicitly true with not only the agency instrumentality analysis, but also the blocked property analysis. Let me start with the Foreign Sovereign Immunities Act. The mandate rule forecloses relitigation of something that has been explicitly or implicitly here. Despite the reservation, any reservation that the plaintiffs may have made, defendants very explicitly put at issue the District Court's failure to grant summary judgment on the FSIA claims, including the 1610b3 claim. We raised that, and the issue was resolved. This Court, in its mandate, made clear in the final paragraphs, defendants do not qualify as a matter of law as the agencies or instrumentalities of the foreign state of Iran, such that defendants' properties may be turned over to help satisfy plaintiffs' judgments under the FSIA, citing Section 1603b, the definition. It sent back on, quote, only two issues, TRIA issues. Nonetheless, the District Court considered them. It was understood by all that the FSIA was over, that plaintiffs sought reconsideration by the panel. We're not saying it has precedential value, but it recognizes that they, too, understood the FSIA claims were gone. The District Court, when it came back, said, I read the Second Circuit's decision as foreclosing the FSIA action. But nonetheless, it reconsidered and changed its mind. Even if the Court could have considered, the District Court could have considered the FSIA. JUSTICE ALITO, I'll have to ask Judge Wesley later, but did the prior decision rule on the 1610b3 issue? It did, Your Honor. And Judge Wesley is best positioned to answer that question, but I will answer it in advance. And the answer to that, Your Honor, is it was explicitly and implicitly decided. It only sent back two issues. They had nothing to do with FSIA. More importantly, Your Honor, it certainly was done implicitly. The definition of agency instrumentality is set forth in 1603b. It applies to the entire FSIA. You have to go through 1603b3, and if you don't go through there, you don't get to the substantive basis of 1610 claims or whatever. So, either you are or you are not an agency or instrumentality under the FSIA, and we said they were not. Correct, Your Honor. That mandate was clear. We said it as a matter of law. Statutorily disqualified. That issue should never have been before it. More — And the District Court judge seemed to think that they didn't waive it because they didn't articulate the 1610b claim, didn't litigate the 1610b claim in front of us. They had the opportunity to do that. And you pressed the issue on the other side, and there's a footnote that says that they didn't raise it. Correct. And so, therefore, it's gone. Yes. And so I won't get into the other arguments on FSIA because it fails nonetheless. But nonetheless, you lost under the TRIA. Why don't you stick with that? Let me address that, Your Honor. I mean, that's where the rubber meets the road, if you ask me. And the definition of agency or instrumentality is far more forgiving and less specific. It's based on plain English. I mean, believe me, this was quite the experience. I mean, you have the same term within the same statute meaning two different things. I've been a judge a long time, and this is the first time that's ever happened. Scalia's spinning in his grave right now. So tell me why the judge was wrong in saying that under TRIA that you were not an agency or instrumentality. I would first like to say, Your Honor, we asked this panel to reconsider the definition set forth in Kirshenblum. We do so for several reasons. By the way, for us to do that, sir, would be to muster a majority of the active judges of this court. Well, I think not, because in the Supreme Court's recent decision in Rubin, the Court read the FSIA, specifically Section 1610, as including the TRIA, which is a note to 1610. That decision undermines this idea that when you're talking about an agency instrumentality of a foreign state, where the foreign state is a terrorist party, you can have different definitions. We think that's not the right result. We think it should be the same definition. That requires some logistics with regard to reading Rubin. It was not the issue that was specifically in front of the Court in Rubin. Correct. It was not. What Rubin calls into question is the panel's assertion that 1610 was a stand-alone matter and didn't inform the definitions that contained within the rest of the statute. But that's the only assertion that Rubin undercuts in the context of what we wrote with regard to your case. It is. It reads them all as one unified body. And this Court in Calderón Cardona said that FSIA must be read as, quote, a coherent regulatory scheme, discordant interpretations of the FSIA and TRIA should be avoided. The problem is because of where they put this stupid thing, where they put the TRIA. I mean, they stuck it in the FSIA, but it's got an entirely different purpose. And the circuits that have examined it recognize that because you're talking about terrorist parties, which don't happen to be sovereign states. They happen to be entities like ISIS and other things like that. And so to encumber the methodology with statehood doesn't make any sense. It doesn't, Your Honor, when you're dealing with foreign terrorist organizations. But when you're dealing with a foreign state, I think it does. I think it does make sense to use the same definition. This Court The term agency or instrumentality means one thing with regard under the TRIA when you're dealing with Iran, but another thing when you're dealing with al-Qaeda? Well, there's certainly reasons to do that and certainly going to be great similarities. So we're not suggesting they have completely different meanings. But we are suggesting that when you're talking about an agency instrumentality of a foreign state, one has to recognize, as this Court did in Rothstein, that a foreign state may have all sorts of services provided, may have all sorts of functions that are necessary to its operations. And people who provide these services, there may be educational services, there may be humanitarian or charitable services. So you propose the nexus idea, right? You need a nexus. And not only do you need it because in this case, Your Honor, agency or instrumentality is a term of art. The District Court applied the Kirshenbaum standard in the broadest way possible. The District Court didn't consider not only what's a material function, but it's a material function of a terrorist. What is a material service to or on behalf of a terrorist? What is to be owned, controlled, or directed by a terrorist? That idea of a terrorist is completely removed. And then you go to a foreign state. And then when you're dealing, what's a service to a foreign state? If Mount Sinai Hospital opened a branch in Iran right now, all of a sudden, Mount Sinai Hospital would be the equivalent of Iran and all of their assets could be seized. In the last three weeks, two banks, Standard Chartered and Unicredit Bank, admitted to providing funds, transferring funds to Iran on behalf of Iranian accounts. All of a sudden, those two banks, because they provided an important service, become Iran and tens of billions of dollars can be enforced against them in judgments? That can't be right. It ignores the term of art. This phrase, agency instrumentality, is not only used in the FSIA, but it's used in the Federal Tort Claims Act, the Foreign Corrupt Practices Act, the ADEA, ERISA. And it suggests majority ownership or close supervisory control, not just an important service or a means to do an important function. That's not enough. If it were enough, then you'd run into due process problems. And as the Supreme Court said in INS v. St. Cyr, where you have plausible definitions, but one offends the Constitution, you have to go with the other definition. The other definition here says you can't attribute a service provider, a mere service provider or a function, a functionality, as the same as the principle. Why? Because it would offend, it would be an irrational, arbitrary deprivation of due process. It would be disproportionate liability. How close does the nexus have to be? If, if, if, I mean, I, the Court was rather, the District was rather, you know, just a, a, a, a, a, a, a, a, a, a, a, an association of the applications. Way too broad. Um, well, where would you draw the line? Would you draw the line at, uh, some kind of operational aspect or would you, or would you acknowledge that if something served as a banking instrument for a terrorist organization, that that might be a material function for the bank, for the terrorist organization? I would tie it to the actual wrongdoing giving rise to the judgments or to the illegality which caused the foreign state to be designated in the first place. You have to have some nexus and where you're dealing with other statutes, there's proximate cause limitations. We don't have that. Isn't providing, uh, financing, um, justice harmful? I think not, Your Honor, when you're dealing with a foreign state. If you're dealing with a foreign terrorist organization, the answer may be yes, but when you're saying, you're talking about Iran and you're saying, look, they have all sorts of operations. They have China's not Iran. We're not holding to attribute China as Iran and therefore hold China responsible, are we? It, it offends all notions of due process if you can say any service is enough. And if you said it's, the service has to be money transmissions in favor of a terrorist event or terrorism, if one is transferring money for the actual terrorist party to do a criminal act or for terrorism generally, it could be, but where you're just holding real estate and sending legitimate rental income to not Iran, this is indirect to Asa, which from 1995 on is shown only. We cross the Asa-Bakmali bridge, uh, round one. You did, you did. So, so once you put it into the hands of Asa, you put it in the hands of Bakmali, you put it into the hands of Iran. That's why it's so dangerous because then if we are found to be a service provider and therefore Iran, then anyone who did a service to us, an important service becomes an agent of Iran too, liable for the full spectrum of the tens of billions of dollars. So you're, you're a great advocate council, but the reality is, is that this, the findings where this entity was controlled and there's a lot of proof that's substantiates a lot of that. Let me address that your honor, because the critical time period as set out in Dole and as your honor knows, incursion bomb is the time of filing. The time of filing is 19, sorry, 2009 to 2013. So let's do 2009. There is an absence of strong evidence of any evidence really where, you know, from 95 on very, very little evidence, certainly from 2004 on nothing. When your, your honor mentioned last time when we were having the same argument to the other side, in October of 2007, there was a meeting with the Iranian ambassador to UN and at that time the ambassador said, do multiple things. One stop giving to any entities unless they're Shia, said, I'd like to meet every three to six months so I can offer views. Maybe I'll set up a cultural assembly so we can share ideas about charity. That's not control. That's in 2007. The evidence from the most recent period, two years before, demonstrates a lack of control. The district court didn't focus on that. She acknowledged, the district court acknowledged that it was relying on a historical perspective. And I would, one last important point. On this point of control, the district court recognized the absence of evidence in the recent past and it did so in a funny way. The district court found, and I quote, the most recent years of what is portrayed as seeming independence is nothing more than a long game whereby the government of Iran fully understands that it must withdraw into the background until a more fortuitous time arises when the New York Foundation's assets may again be employed for use by the government of Iran. That long game strategy was nowhere in the evidence. There was nothing to support. There was pure speculation. And it was a band-aid. It was a shortcut to say, sorry, the absence of evidence is evidence in and of itself. This was a district court determined to find this and did. Lastly, on the property of three minutes, we'll hear from the other side. You can, you have your time for rebuttal. Thank you. Yep. May it please the court, James Bernard on behalf of the judgment creditors. There have been four issues raised today that I'd like to address. The three that counsel raised concerning the mandate on the FSIA claim, the overbroad standard with respect to TRIA and the historical analysis. And then also from the prior argument, the Fifth Amendment invocation issues are also raised in our matter, so I'd like to address that as well. Why don't I start with the issue of the overbroad standard? I think it's critically important to recognize that when we're talking about TRIA, in the first instance, the assets have to be blocked. And so before we even reach the question of whether or not as an agency or instrumentality of a terrorist party, whether or not they are that, the assets at issue need to be deemed blocked. And that's critical because the finding that's necessary for that and the finding that Judge Forrest made that is not challenged here in this argument today, that the defendants provided services that were a benefit to Iran, then link in specifically to the preamble and the other terms of the executive order, which, for example, say the following. Particularly in light of the deceptive practices of the Central Bank of Iran and other Iranian banks to conceal transactions of sanctioned parties, the deficiencies in Iran's anti-money laundering regime, and the weaknesses in its implementation, and the continuing and unacceptable risk posed to the international financial system by Iran's activities, once that executive order, which is 13-599, is triggered because there is a finding that these defendants did those things, they provided a benefit to Iran, I submit that's the sufficient nexus, if a nexus is even required under this Court's articulation of the agency or instrumentality standard, because they are doing the very thing that the President declared to be a national emergency. They are hiding Iranian assets in the United States for purposes of transferring funds to Bank Melli and then ultimately to Iran, and the executive branch determined that that conduct, in and of itself, was an unacceptable risk. Now, any further nexus requirement beyond that takes the blocked asset quality of these assets and imposes an additional requirement beyond that that certainly wasn't set forth in Kirshenbaum, and to the extent that the Court wants to look to stancel from which this Court drew that standard, in stancel that level of a nexus requirement wasn't required either. So I submit that on this record, any nexus requirement beyond simply what the Court already required, by virtue of the materiality requirement and by virtue of everything else that it said in Kirshenbaum, is found, is satisfied, and the District Court actually made explicit findings on that matter. I should add, while I'm talking about the overall, or the overbroad standard issue, Judge Wesley, you raised this question, too, about counsel's argument as to why the standard in Kirshenbaum should be reconsidered here. There's absolutely nothing in Rubin that addresses the fundamental reason why, in this Court, in Kirshenbaum, treated agency and instrumentality differently. In 1603, the language is agency or instrumentality of a foreign state, and in TRIA, the standard is agency or instrumentality of a terrorist organization. There's nothing in Rubin that addresses why a distinction, why that distinction in language shouldn't somehow be relevant. Rubin, as Your Honor indicated, was about a completely separate issue of whether 1610G is a standalone requirement. So, there's no reason for this Court to reconsider the Kirshenbaum standard. Let me turn next to the second issue that I wanted to address, which is the historical analysis and the point about the time of filing requirement. I think in the first instance, it's important to bear in mind where that rule comes from. That rule comes from the Supreme Court's decision in Dole, which was addressing 1603 and was asking whether or not the entities that were involved in Dole were majority owned by the Government of Israel. Now, majority ownership, especially at the time of the filing of a complaint, is something that courts and fact-finders can do with relative ease and objectivity, just like the Supreme Court did. You just simply look to see whether or not the Government of Israel, at the time the complaints were filed, owned more than 50 percent. Not so with the question that this Court directed the District Court to ask in finding whether or not the defendants were agencies or instrumentalities of a terrorist party. Inherently, in dealing with that question, we're dealing with subterfuge, we're dealing with deception, we're dealing with efforts to hide exactly what was happening and who the true beneficiaries are. And believe me, this is not just mere rhetoric on my part. Let's remember that this Court specifically found last time in the forfeiture appeal that Alavi had been lying to the New York Attorney General's Office since 1989 about who the true owners of Asa were. Those lies continued all the way up through trial in this matter, and through trial in this matter. We have multiple instances in the record that the District Court found of those kinds of acts of deception. And I'd like to just review them briefly because I think it's extremely relevant to the time of filing analysis. We have the 1989 lie to the New York Attorney General's Office about who the straw owners of Asa really were. That's at page 363 of the District Court's Special Appendix 363. We have this Court's finding in the prior appeal, at page 91, that they had concealed Bank Mellie's true ownership of Asa. We have the District Court's specific finding that in District Court proceedings in this circuit, Alavi's executives and officers lied in depositions and lied in submissions to the Court about what role Iran had had in organizing its affairs and in running its operations. Specific findings at page 382 and 383. Another specific finding, in 1995, the New York Attorney General, likely as a result of the sanction regimes, sent a letter to Alavi asking them to identify who Asa was. What was the answer? After placing a series of worldwide advertisements seeking co-investors, we found Asa. That's a lie. And the lies continued through the Gabay litigation, again in deposition testimony, through the filing of these actions, and then culminating in late December 2008, when the president of Alavi, Mr. Jahedi, is served with a subpoena asking for documents that would have shown what the relationship was between Asa and 655th Avenue and Alavi. What does he do? He goes to a dumpster and tries to shred the documents. This is not a case, therefore, where that historical evidence is completely irrelevant to the question of what services the defendants were providing to the terrorist party. They were trying to conceal their relationship to Iran, starting in 1989 and right up through trial. Now, in their briefs in opposition, counsel makes the argument, and I want to emphasize to the Court that I don't take this point lightly, that generally speaking, we do not sanction parties for the positions that they take in litigations. It's okay to litigate and lose. And when that happens, we don't always say, you know what, these are bad guys, they committed perjury or something like that. But sometimes you do. And there are two decisions I bring to the Court's attention that I think are relevant on this, United States v. Boyd and United States v. Stewart, which, as this Court knows, is settled law, that where a defendant takes the witness stand at trial and lies, because ultimately a jury finds that whatever it was that the defendant tried to do, deny knowledge, deny involvement, is ultimately found by the jury not to be true, district court judges can impose an enhancement for obstruction of justice for that testimony. Essentially, exactly what we say should happen here as a result of their conduct right up through the time of the filing of the complaint. So I'll sum up on this by just simply saying, number one, the standard for time of filing of the complaint under Dole I think needs to be read in light of the difference between, just like this Court did in Kirshenbaum, time of filing with respect to terrorism and time of filing with respect to majority ownership. And that, number two, once you do that, the record here and the findings by the district court were certainly not clearly erroneous. Judge Wesley, there's also a number of specific findings that the district court made on the issue of control. And one of the key things that I would emphasize is the appointment of board members, there's some five or six of them in the record, who were appointed historically, but who remained board members right up through the filing of the complaints. That's the kind of control that the Court found in Kirshenbaum did not rise to the level of an alter ego violation. But I submit does rise to the level of the lesser standard that the Court was clearly imposing under Kirshenbaum for agency or instrumentality. Let me move on to the mandate issue and to the Fifth Amendment issue. Your Honor, on the mandate issue, this is what I would say. First of all, I think as Judge Chin recognized, it's critical to remember that we did not intentionally bring our 1610b3 claim to this Court. We didn't move on summary judgment for it, and it therefore wasn't before this Court on appeal. The question then is. I'm not sure I recognize that. I was just asking a question, by the way. Fair enough, Judge. No, I didn't mean to suggest that you recognized it then. I want to be clear about it then, that as a factual matter, that is a true statement. We did not move for summary judgment under 1610b3, and therefore, this Court did not by necessity address that on appeal. I think the heart of the issue becomes the 1603 issue. Sure, I mean, because 1603 is the first step you have to take before you get to 1610. That's correct, Judge. And let me, if I can find it quickly. It's okay, I can do it from memory. What Your Honor held, what this Court held under 1603 had no relationship whatsoever to the arguments that we raised on remand, and it's because of this. It's a little complicated. We had previously argued that we could pierce the citizenship of the defendants using bank check. So we had previously argued that a lobby and 650s status as citizens of New York, arguably with respect to the partnership, but certainly with respect to the corporation, could be pierced as a result of bank check. What this Court held incursion bound was that as a matter of law, that was wrong. We could not do that. That was the issue that was explicitly decided incursion bound. When we went back down to the district court, we did not argue anything whatsoever with respect to the citizenship status of the defendants being able to be pierced through bank check. Instead, what we argued on the issue of citizenship status was the 655th Avenue Corporation is a partnership. It doesn't have a citizenship, so it could potentially be under 1603. Precisely correct, Your Honor. And the only thing this Court decided on that issue, and I use the word decided in quotation marks, was dicta in a footnote that that was entirely proper. I presume you're right. How do you fit under the other categories of 1603B? Is it Oregon? Yes, Your Honor, that's correct. In fact, the district court made specific findings of fact on the Oregon issue. She ignored the requirements of Dole as to majority ownership. I mean, so she, I mean, I- Your Honor, if I may. I find her analysis wanting on that side of the things. The reality is, is if you win under the TRIA, you don't care, do you? I do care to one extent, Your Honor. I do care. I know I should say- Your Honor, I'm certain that you do care. I know, I understand for many reasons why the appropriate answer to that question may have been I don't care. But there is actually two reasons why I'll give you why I do care. That's fair enough, go ahead. One is that technically, under TRIA, our clients are only entitled to recover compensatory damages, not punitive damages. And I don't know where this case is ultimately going to end up and how long it will take for us to ultimately be able to obtain turnover of these assets and whether or not by that point in time, our client's compensatory judgments may be satisfied and therefore we're only looking to recover the punitive damages portion. The other reason, Your Honor, is just simply that since the issues have been briefed and since this is now potentially a case that could go further up to the Supreme Court or otherwise, or back down again. I would ask that the court resolve the FSIA issues. With indulgence, just for a second. If you want to engage in this, I'm happy to do so, because the definition and the non-exclusive factors to consider with regard to whether something is an organ or not. The author of that opinion happens to be another member of this panel, Judge Parker. I am aware. Miller versus Hand that Bank. And those factors are whether the foreign state created the entity for a national purpose. I don't think so. Whether the foreign state activity supervises the entity. Well, there's factual issues and I think you say that it does. Whether the foreign state requires the hiring of public employees, not so. Whether the entity holds exclusive rights to some right in the foreign country. And how the entity is treated under foreign state law. This will have to go back, because she didn't do that, did she? She did, Your Honor, actually. She has an entire section of the opinion below, addresses all of those filler factors. Well, I thought pretty much she got on bank heck and wrote it. And just concluded that these were all just alter egos of- No, Your Honor. Actually, the district court, and I can find the specific- It's all right. Yeah, the court will see it. But the district court judge clearly recognized the filler factors. Addressed all, not all of them, but addressed five of them. Weighed them, discussed the evidence that she believed supported a finding with respect to each of the filler factors. And I submit it wasn't clearly erroneous. Let me move on then. The last issue, yeah. Yeah. So the last issue with respect to the Fifth Amendment invocation that was argued earlier. I just wanted to say to the court that with respect to the bench trial, the district court judge made a very specific finding. That even though she was relying on, and I guess the more accurate phrase might be to say cited and referred to some of the Fifth Amendment invocation questions that we had introduced into evidence. That her findings of fact with respect to all of the matters that we've discussed today existed or that she would have ruled that way independently of the Fifth Amendment invocation issues. And so therefore, in the event the court were to determine that the Fifth Amendment invocations or the way in which that was handled was not in some way proper. What about precluding them from revoking their invocation and testifying? Yeah, your honor, a couple of points on that. Number one, your honor asked the question in the last argument whether there was prejudice. And with us, judge, yes there was prejudice. And it was very specific kind of prejudice because on appeal last time, our bank check claims were dismissed as a matter of law. That means we were no longer with a bank check claim on remand. Now, allowing discovery to be reopened with respect to some witnesses who could testify as to some matters, with respect to a claim that this court already said we had produced insufficient evidence as a matter of law, would have been prejudicial to us. If we were able to litigate that claim and take that testimony, that's a different matter. But that is a form of prejudice to us. And the arguable prejudice with respect to parading this stuff in front of the jury wouldn't apply. That's correct, your honor. And the only other thing I would say on this point, because the record on this actually gets a little confused with respect to what is happening in the forfeiture action versus what is happening in our action. But I did want to call attention to the particular record site that got referenced earlier where council first raised this issue. Because I think it illuminates the, I'll say, hedging nature of precisely what was put before the court and what we were on notice of. It's at page 1204 of the appendix. And let me just read the quote. We understand, this was counsel for the defendants, we understand that at least some, if not all of them, have decided that they would be willing to testify. And I expect that the government, if we intend to call them, would certainly want an opportunity to depose those individuals. I submit that the statement, if we intend to call them, is far from a clear indication either by name or of actual intent to do so, such that we, in our case, should have been put on any sort of notice, judge. But the response was you can't call them, no matter what. I acknowledge that, but it's important to appreciate, I think, the procedural posture in which that happened, which is that the government ultimately moved that the Fifth Amendment invocation shouldn't be withdrawn. Thank you. I have nothing further. Thank you. We'll hear the rebuttal. Thank you, Your Honor. Council said at the beginning that there were findings that were not challenged. I just want to be clear. We challenge all of the district court's factual findings. The factual findings were based on the exclusion of 14 of our witnesses, and two of those witnesses were very important, particularly on issues of control and what had happened in the last several years. Council started with blocked, whether these assets were blocked. The blocked issue doesn't address whether these entities were agencies or instrumentalities, and I noted that council failed to disclose or mention, I'm not saying he's hiding this in any way, that the issue of blocked property has to be made as of the time of decision, June 17. There was no evidence. The court specifically found that the blocking issue was the same analysis as her historical analysis, certainly time of filing and years before. That wasn't June 17, it was a mistake. And I will tell you also that in terms of time of filing, Mr. Bernard went through an analysis, kind of going through a chronology. And he started in 1989 and he went to Gabay, which was 1996. Then he jumped from 1996 to 2008, and he talked about the President's destruction of evidence. I urge you to look at the evidence, those five pages of documents, or five documents that were shredded. They had nothing to do with control, nothing to do with any relationship with ASSA. That wasn't telling information, that wasn't evidence of control. And it was telling to me that Mr. Bernard skipped from 1996 to 2008. There was no evidence there. Just like the district court was confronted with the fact that there was no evidence of control in the time of filing or near the time of filing. And that's why the district court relied on this theory of a long game without evidence to support it. So, let me focus on the mandate. The court found that that issue was waived. It certainly is not permitted for plaintiffs, defendants, any party to do a piecemeal approach to litigation to filing an appeal. So it cannot be that the folks here, the claimants, I'm sorry, the plaintiffs appealed their issues, their claims under the FSIA, but chose not to bring this one up. And somehow that's preserved, they have another bite at the apple. That's not the way it works. This issue was flatly decided. And your honor had focused on the organ issue. The filler factors are not met here. One only need look at the time of filing and the evidence by the district court. That 150 page opinion is overwhelmingly evidence well before the sanctions even went into effect. Certainly not evidence of 2009. But more than just that, as we cite in our brief, the relevant FSIA section here is 1610B3. That only applies when the judgment relates to a claim for which the specific agency instrumentality is not immune. This court in Walters, the Seventh Circuit in Rubin, said the judgment must be against that particular agency instrumentality. It doesn't work when the judgment, like this one, was against the government of Iran. That doesn't work under this 1610B3. The plaintiffs had a 1610A7 claim, but they don't even dispute. They agree that that one is gone. That was the claim that they needed to bring to enforce a judgment against Iran. This 1610B3 claim requires the judgment be against this particular alleged agency instrumentality. It was not. Thank you. Thank you. We'll reserve decision.